**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 9, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RAYMOND MONTOYA,

    Plaintiff - Appellant,

v.

JACOBS TECHNOLOGY, INC.,

    Defendant - Appellee.

No. 18-2098
(D.C. No. 2:17-CV-00081-WJ-SMV)
(D. N.M.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.
_____

Raymond Montoya appeals from the district court's order granting summary

judgment in favor of his former employer, Jacobs Technology, Inc. (Jacobs), on his

claim for age discrimination. Exercising jurisdiction under 28 U.S.C. § 1291,

we affirm.

___

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# I.  BACKGROUND

Montoya began working for Jacobs in 1995.  From at least 2011 until he was terminated at age 49 in July 2015, Montoya worked as a systems test mechanical technician.  At all relevant times, Montoya reported to Dennis Smith.

The event giving rise to Montoya's termination took place on July 10, 2015, when Smith learned that Montoya and another Jacobs employee, Louis Lombardi, had been involved in a workplace incident.  Montoya needed to borrow a work truck from Lombardi, and Lombardi agreed to lend him the truck.  But before Montoya could get into the vehicle, Lombardi decided that he should check with Montoya's team lead before turning over the truck.  Lombardi told Montoya to wait while he obtained authorization and drove off to check with Montoya's supervisor.

When Lombardi returned, he saw Montoya standing in the middle of the road, facing the passenger side of the truck.  According to Montoya, Lombardi deliberately drove the truck at him, hitting the left side of his body.  Lombardi, on the other hand, said that as he was trying to slowly maneuver the truck around Montoya, Montoya reached out and shoved the truck or hit it with his arms.  There is no dispute that Lombardi then got out of the truck and the two men exchanged words.

Next, Montoya and Lombardi went to Smith's office to report the incident. Smith was not in, so Montoya contacted him by telephone.  After listening to Montoya's account, Smith told Montoya to go to the on-site dispensary for treatment. The dispensary found no serious injuries, but nonetheless referred Montoya to the

2

hospital, where he complained of bruising on his left arm and leg. The hospital released him with no restrictions.

Later the same day, Jacobs's Human Resources Manager, Yolanda Ramos, met with Montoya, Lombardi, and two other men who had been at the scene. The two men told Ramos they had not seen what happened. Ramos, who was then joined by Smith, Jacobs Director Brant Adams, and union representative Chris Valdivia, interviewed Montoya and Lombardi. Both men were warned at the outset of their respective interviews that providing false or misleading information could result in termination.

Lombardi stated that he tried to drive the truck around Montoya, but as soon as the front of the truck passed Montoya, Montoya reached toward the truck and made some movement with his hands. For his part, Montoya said that he was facing the truck and standing on the passenger side when Lombardi sideswiped him.

The following Monday, July 13, 2015, Ramos interviewed a third witness—Manny Saldivar—a welder who worked for an outside company. Saldivar confirmed Lombardi's account of the incident: "[Lombardi] started to go around [Montoya] with the truck and it looked to me that [Montoya] stepped forward and slapped the truck with one hand and punched the truck with his other hand." Aplt. App., Vol. 1 at 178. "I even told [a coworker], '[Montoya] just punched the truck.'" *Id*. at 179. When asked whether the truck had struck Montoya, instead whether Montoya had struck the truck, Saldivar said, "I saw [Montoya] hit the vehicle." *Id*. Saldivar also

3

said that Montoya was "facing the passenger door" when he hit the truck with his hands. *Id*.

That same day, Ramos prepared a report that summarized the accounts given by Montoya, Lombardi, and Saldivar. She recommended that Montoya be discharged for several reasons, including his having provided untruthful and misleading information during the investigation. Specifically, Ramos noted that "[w]e cannot comprehend how an individual who is facing a vehicle, states that he is struck by the passenger side of the vehicle, yet is injured on his left thigh and his left arm." *Id*. at 197-98. As to Lombardi, Ramos recommended that he be suspended for three days and given a written warning for violating several company rules.

Adams and Smith agreed with Ramos's recommendations, and Adams fired Montoya. *See id*. at 199, 205. He relied on two factors: (1) safety violations, and (2) his belief that Montoya had lied. *See id*. at 205.

Montoya sued asserting five claims: (1) age discrimination, (2) disability discrimination, (3) failure to accommodate his disability, (4) retaliation in response to his complaints of age discrimination, and (5) retaliation in response to his complaints of disability discrimination. The district court granted Jacobs's motion for summary judgment on all claims. Montoya appeals only the portion of the order dismissing his age-discrimination claim.

## II. STANDARD OF REVIEW

"We review the district court's grant of summary judgment de novo, applying the same standard used by the district court." *Riggs v. AirTran Airways, Inc.*,

4

497 F.3d 1108, 1114 (10th Cir. 2007). Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "In making this determination, we view the evidence in the light most favorable to . . . the non-moving party, and draw all reasonable inferences in [his] favor." *Riggs*, 497 F.3d at 1114. The court resolves a motion for summary judgment in an employment-discrimination case the same way it would resolve "a motion for summary judgment in any other civil action: the court acts as a gatekeeper, granting judgment as a matter of law unless the plaintiff has adduced relevant and probative evidence sufficient to support a jury verdict in his . . . favor." *Id*. at 1117.

### III. ANALYSIS

Under the Age Discrimination in Employment Act (ADEA), an employer cannot "discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA protection extends to individuals who are 40 years of age or older. *See id*. § 631(a). "[A] plaintiff suing under the ADEA must prove that the challenged employment action was motivated, at least in part, by age." *Riggs*, 497 F.3d at 1114. This burden may be met "either by presenting direct evidence of the employer's discriminatory intent or by presenting circumstantial evidence creating an inference of a discriminatory motive using the tripartite burden-shifting analysis" articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Riggs*, 497 F.3d at 1114. burden-shifting analysis." *Id*. Because Montoya

5

has no direct evidence of discriminatory intent, his claim must rely on circumstantial evidence and proceed under the *McDonnell Douglas* framework.

"Under *McDonnell Douglas*, the plaintiff first bears the burden of proving a prima facie case of discrimination." *Id*. "If the plaintiff successfully proves a prima facie case, the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action. Once the employer [does so], the burden shifts back to the employee to prove that the proffered legitimate reason was a pretext for discrimination." *Id*. at 1114-15 (citation omitted).

For purposes of appeal, Jacobs assumes that Montoya could establish a prima facie case of age discrimination, and Montoya concedes that Jacobs has articulated a legitimate, nondiscriminatory reason for its decision to terminate his employment. As a result, "[t]he employer's articulation of a legitimate, nondiscriminatory reason for the adverse employment action causes the presumption of discrimination . . . to simply drop out of the picture." *Timmerman v. U.S. Bank, N.A*., 483 F.3d 1106, 1113 (10th Cir. 2007) (brackets and internal quotation marks omitted). Now, the only issue is whether Montoya met his burden to "show[] that the proffered reason [for his termination] is a pretext for illegal discrimination." *Id*. (internal quotation marks omitted). We agree with the district court that Montoya "failed to carry his burden of showing that [Jacobs's] legitimate reason for discharge was a pretext." Aplt. App., Vol. 2 at 499.

"Under our precedents, a plaintiff can establish pretext by showing the defendant's proffered non-discriminatory explanations for its actions are so

6

incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude they are unworthy of belief." *Johnson v. Weld Cty.*, 594 F.3d 1202, 1211 (10th Cir. 2010) (brackets and internal quotation marks omitted). "Evidence that the employer should not have made the adverse employment decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (brackets and internal quotation marks omitted). Thus, even if a jury could conclude "that [Jacobs's] decision was intemperate and unfair," as Montoya alleges, "[s]uch considerations . . . are not within the purview of . . . the ADEA." *Timmerman*, 483 F.3d at 1120 (internal quotation marks omitted). "[T]he issue is not whether the decision to terminate [Montoya] was wise, fair or correct, but whether [Jacobs] reasonably believed at the time of the termination that [Montoya] had violated company policy, and acted in good faith upon that belief." *Id*.

Montoya argued in district court, and repeats in this court on appeal, that "[a] reasonable trier of fact could conclude that Jacobs' stated reasons for terminating Montoya were [a pretext for age discrimination]." Aplt. Opening Br. at 26-27. But "[t]o support an inference of pretext, . . . a plaintiff must produce evidence that the employer did more than get it wrong. He or she must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *Johnson*, 594 F.3d at 1211.

Montoya cites seven facts that he contends raise a genuine issue about whether Jacobs's beliefs were sincere. None of this evidence, however, relates to the beliefs of the decision-maker Adams, or Ramos, the human-resources manager who conducted the investigation and made the recommendation to terminate Montoya. As such, Montoya cannot satisfy his burden to present evidence of pretext.

First, Montoya argues that "inconsistencies" regarding the reason he was terminated and who made the decision to fire him "would allow a reasonable factfinder to question the credibility of Jacobs' stated reasons." Aplt. Opening Br. at 27. It is unclear whether Montoya raised this argument in the district court. Nonetheless, we agree with Jacobs that the record does not support these assertions. Adams, Ramos, and Smith all disbelieved Montoya and found safety violations. No one disputes that Adams made the final decision with input from Ramos and others.

Second, while it is true that Montoya and Lombardi gave different accounts of the incident, Jacobs's believing Lombardi does not make the decision insincere. "This court's function is not to second guess business decisions made by employers, and our inquiry is not whether [Jacobs's] decision to fire [Montoya] was ultimately correct or wise." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 463 (10th Cir. 2013) (internal quotation marks omitted).

8

Third, contrary to Montoya's assertion, Smith did not say that the *conclusion* that Montoya lied was illogical. What Smith actually said was that walking into the truck was not a "logical" thing to do. Aplt. App., Vol. 2 at 328. Indeed, "based on the results of the investigation," including Montoya's statement that he was facing the truck on its passenger side yet was stuck on his left side, the only logical conclusion Smith could reach was that Montoya had walked into the truck. *Id*. at 329-30.

Fourth, Montoya's reliance on Smith's and the union representative's deposition testimony about never having had reason to question Montoya's truthfulness avails nothing. The union representative was not part of the decision-making process, and Smith's testimony concerned his observations as Montoya's supervisor, not as the decision-maker. Moreover, Smith testified unequivocally that he believed that Montoya had been untruthful about the July 10, 2015 incident.

Fifth, Montoya argues that Adams failed to ask him for his "side of the story," which demonstrates his indifference. Aplt. Opening Br. at 29. This argument overlooks the fact that Adams was present when Ramos questioned Montoya and was well aware of his version of events.

Sixth, Montoya maintains that Lombardi's more favorable treatment—a three-day suspension—is evidence of pretext. In this regard, he relies on *Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1311 (10th Cir. 2017), in which we recognized that "showing disparate treatment—by demonstrating that the employer treated employees similarly situated to the plaintiff employee differently (i.e., more

9

favorably)—is a particularly potent instrument to discredit an employer's allegedly legitimate reasons." The problem for Montoya, however, is that he is not similarly situated to Lombardi. Jacobs determined that Montoya provided false and misleading information about the incident. By contrast, Lombardi's version of events was corroborated by a third-party witness. Because there are significant differences between Montoya's and Lombardi's conduct, Montoya's "allegations of disparate discipline do not suffice to show pretext." *Salguero v. City of Clovis*, 366 F.3d 1168, 1177 (10th Cir. 2004).

Last, Montoya maintains that Jacobs did not follow company policy in firing him, which in turn demonstrates pretext. We agree with Montoya's general statement that pretext can be shown by evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances. It is equally true, however, that where "progressive discipline [is] entirely discretionary . . . , the failure to implement progressive discipline is not evidence of pretext." *Timmerman*, 483 F.3d at 1120.

The stated purpose of Jacobs's policy is "[t]o provide employees with *guidelines* regarding disciplinary actions . . . ." Aplt. App., Vol. 2 at 441 (emphasis added). Further, the policy defines "discharge" as "[a]ction taken for a serious offense or for repeated minor offenses," but does not further define "serious" or "minor." Therefore, whether an offense is "serious" is left to the discretion of the company. Jacobs determined, in its discretion, that Montoya's offense was "serious"

and that he should lose his job.  This discretionary decision is not evidence of pretext.

## IV.  CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.


Entered for the Court


Gregory A. Phillips
Circuit Judge

11